IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATHANIEL CRAIG, | ) | CASE NO. 1:16-CV-2503 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Nathaniel Craig ("Craig") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying his application for

Disability Insurance Benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties. Doc. 11.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Craig protectively filed an application for DIB on July 3, 2013, alleging a disability onset

date of October 2, 2009. Tr. 20, 192. He alleged disability based on the following: degenerative

disc disease, high blood pressure, complicated migraines with stroke-like symptoms, blood clots

in legs and lungs, asthma, diabetes, difficulties from back surgery, pinched nerves in back and

arthritis in back. Tr. 196. After denials by the state agency initially (Tr. 107) and on

reconsideration (Tr. 119), Craig requested an administrative hearing. Tr. 134. Prior to the

hearing, Craig amended his alleged onset date to February 4, 2012. Tr. 191, 39. A hearing was

held before Administrative Law Judge ("ALJ") Jeannine Lesperance on August 25, 2015. Tr.

38-67.  In her November 24, 2015, decision (Tr. 20-32), the ALJ determined that there are jobs

that exist in significant numbers in the national economy that Craig can perform, i.e. he is not

disabled.  Tr. 31.  Craig requested review of the ALJ's decision by the Appeals Council (Tr. 15)

and, on August 25, 2016, the Appeals Council denied review, making the ALJ's decision the

final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Craig was born in 1967 and was 46 years old on the date his current application was filed.

Tr. 20, 42.  A prior disability application was denied on February 3, 2012.  Tr. 22, 74-84.  Craig

last worked as a semi-truck driver and dock worker in 2009.  Tr. 45-46, 60-61.

### B. Relevant Medical Evidence

An MRI taken of Craig's lumbar spine on March 23, 2010, showed a small focal disc

herniation at L4-5 posterolaterally on the right, with some focal neural foraminal encroachment.

Tr. 310.  The L4-5 disc also had slightly decreased signal intensity, suggesting some

degenerative disc dehydration, and showed minimal bulging that minimally indented the dural

sac anteriorly.  Tr. 310.

In the fall of 2010, John Collis, M.D., performed a lumbar laminectomy with

foraminotomy on Craig.  Tr. 253.  On December 16, 2010, Craig returned to Dr. Collis and

reported that his pain was unchanged.  Tr. 253.  Dr. Collis remarked that Craig had developed

meralgia paraesthetica in his thighs: "This has nothing to do with his surgery, but possibly

positioning."  Tr. 253.  Dr. Collis believed that Craig had decompression "around the before

type-painful area" and recommended epidural injections.  Tr. 253.

On September 21, 2011, Career Assessment Systems, Inc., compiled a "comprehensive vocational evaluation report" for Craig upon a referral from the Bureau of Vocational Rehabilitation. Tr. 254-275. During the evaluation, Craig reported chronic migraines that occurred approximately 3-4 times a week and lasted between 8 hours and two weeks and varied in severity. Tr. 255. During a migraine he was unable to function and spent the duration lying in a dark room with an ice pack. Tr. 255. He also experienced the following post-migraine effects: slurred speech, numbness in his face and fingers, blurred vision, disorientation, and loss of concentration. Tr. 255. He detailed his back history: a car accident in 2003, his back surgery in 2010 which provided minimal relief, and continuing back and neck pain and stiffness and numbness in his legs and 3-4 fingers on both hands. Tr. 255. The report concluded that Craig had a "severe deficit in his ability to work in environments requiring lifting, carrying, and standing due to diagnosed back and nerve damage, and standing, sitting, and walking restrictions." Tr. 260. Craig had a "moderate deficit in his ability to meet schedules and maintain good attendance, due to the diagnosed migraine headaches and related effects" and "a severe deficit in his ability to meet the demands of high performance work environments." Tr. 260. He was assessed as functioning, overall, on an average level, "suggesting a relative ability to function independently in most competitive employment environments at this time." Tr. 259. The report concluded that Craig "**is** a viable candidate for competitive employment at this time." Tr. 267 (emphasis in original).

On July 20, 2012, Craig saw neurologist William R. Bauer, Ph.D., complaining of migraine headaches and chronic neck, mid and low back pain with radiculopathy. Tr. 326. Craig reported that his migraines had been causing more severe pain, but they were further apart in time than previously. Tr. 326. He described his pain as 3/10 with rest, 10/10 with activity,

and, at that visit, 8/10.  Tr. 328.  His pain decreased with heat, rest, lying down, quiet, sitting, medication and massage and increased with cold, activity, standing, and walking.  Tr. 328.  Upon exam, he had decreased neck extension with mild muscle tenderness in his trapezius and moderate tenderness in his paracervical muscles, mild tenderness in his thoracic spine, a labored range of motion in his lumbar spine, and symmetrical decreased arm and leg strength.  Tr. 328.  Dr. Bauer diagnosed Craig with lumbar sprain and strain, neck sprain and strain, back pain, and headache.  Tr. 328.   He prescribed Ultram, Depakote, Vicodin, Topamax, Zanaflex, Trileptal, and Flexeril.  Tr. 328-329.

On October 17, 2012, Craig returned to Dr. Bauer for a follow up visit.  Tr. 331.  He reported that his pain level was a 9/10.  Tr. 331.  He complained of headaches, back pain, muscle cramps, muscle weakness, stiffness, and parasthesias.  Tr. 332.  Upon exam, he was in no acute distress.  Tr. 332.  He had diminished reflexes and strength in his arms and legs and positive straight leg raise tests.  Tr. 333-334.

On September 4, 2013, Craig had a lumbar spine x-ray taken.  Tr. 396.  The x-ray showed normal alignment, maintained disc spaces, no evidence of spondylolysis or spondylolisthesis, mild facet arthropathy at the L5-S1 level, and an osteophyte arising from the superior lateral endplate of L4 on the left at the L3-4 level.  Tr. 396.

On February 4, 2015, Craig visited general practitioner Eric G. Prack, M.D., at the Fisher Titus Medical Center.  Tr. 465.  Craig complained, among other things, of worsening bilateral shoulder pain, left greater than right, worsening radicular pain into his posterior legs, worsening headaches, and numbness in his fingertips.  Tr. 465.

On March 17, 2015, Craig saw Adam J. Hedaya, M.D., at the pain management clinic at the Fisher Titus Medical Center.  Tr. 427-429.  Craig complained of low and mid back pain, neck

pain and leg pain.  Tr. 427.  He rated his pain 9/10, described it as sharp and achy, and stated that it got worse with sitting, standing, walking, climbing the stairs, twisting, lifting, pushing, pulling, and cold.  Tr. 427.  He also complained of paresthesias in his bilateral thighs, feet, hands, and, at times, his face.  Tr. 427.  Upon exam, Craig was alert, oriented and attentive.  Tr. 428.  He had severe tenderness to palpation over his lumbosacral spine and extension, flexion and rotation aggravated his pain.  Tr. 428.  He had positive straight leg raise testing, depressed reflexes symmetrically in his knees and ankles, and no muscle atrophy, fasciculations or spasms.  Tr. 428.  His cervical spine showed positive facet loading maneuvers and some associated spasm and some spasm in his thoracic spine.  Tr. 428.  He had no radiculopathy in his upper extremities or thoracic areas or signs of myelopathy.  Tr. 428.  Dr. Hedaya assessed Craig with pain secondary to "posterior laminectomy syndrome with possibly some associated lumbar neuritis, lumbar spondylosis," and neck pain which "may be secondary to cervical spondylosis with some associated cervical spasm."  Tr. 428.  He ordered a lumbar MRI, a cervical and lumbar x-ray, offered an epidural injection at the L5-S1 level, and prescribed Norco.  Tr. 428.

On April 22, 2015, Dr. Hedaya gave Craig a caudal epidural steroid injection.  Tr. 434.

On May 5, 2015, Craig saw Dr. Hedaya again and reported some relief from his injection.  Tr. 430.  He complained of parathesia in multiple areas of his body and reported that the pain was primarily in his head, 8/10.  Tr. 430.  He also reported pain in his lower back and his neck and into his shoulders.  Tr. 430.  His lower back pain was greater on the right side and it went down into his thigh and knee.  Tr. 430.  He reported, "Medications and repositioning are helpful."  Tr. 430.  He had not gotten his MRI or any of his x-rays.  Tr. 430.  Dr. Hedaya again ordered imaging tests and stated that he would re-evaluate after reviewing these.  Tr. 430-431.

The same day, Craig obtained x-rays of his spine.  Tr. 436-437.  The results showed

minimal marginal spurring at L3-4 in his lumbar spine, mild thoracic spondylosis in his thoracic spine, and a negative x-ray of his cervical spine. Tr. 436-437.

On May 19, 2015, Craig returned to Dr. Hedaya complaining of severe pain, 10/10, described as stiff and throbbing and "unbearable." Tr. 432. His medication was somewhat helpful. Tr. 432. He reported minimal relief from the epidural injection, stated that he had not felt well enough to start physical therapy, and reported that "all areas of functioning are deteriorating." Tr. 432. Upon exam, he was alert, oriented and attentive. Tr. 432. He had multiple tender points all over his body "consistent with fibromyalgia picture." Tr. 432. He had tenderness over his cervical, thoracic and lumbar muscles, depressed but symmetrical reflexes in his upper and lower extremities, and an unremarkable gait and station. Tr. 432-433. After reviewing the recent x-rays and an MRI from 2010, Dr. Hedaya and assessed that Craig's "pain picture may be secondary to cervical facet joint syndrome, cervical spasm, cervicogenic headaches," and "the possibility of thoracic spondylosis, lumbar spondylosis, lumbar disc displacement." Tr. 433. Dr. Hedaya saw "no imminent need for surgical evaluation," and, instead of another injection, preferred to see how Craig did after a course of physical therapy. Tr. 433.

On June 9, 2015, Craig returned to Dr. Eric Prack for a follow up visit. Tr. 520. Craig reported being "very disappointed in [his pain management] care." Tr. 520. He stated that his migraine headaches were well controlled by his medication, but that his back injections tended to exacerbate his migraine headaches. Tr. 520.

On June 29, 2015, Craig saw Dr. Bauer for a follow-up after his pain management referral. Tr. 574. Craig stated that he had increased pain due to pain management taking him off all his pain medications. Tr. 574. He rated his pain as 10/10, a 10 being the worst he has ever

felt. Tr. 574. Upon exam, Craig was in no acute distress and was oriented, awake and alert. Tr. 575. He had tenderness at L5-S1 near his surgical scar, a flattening of his lumbosacral curve, positive straight leg raise testing, and reduced ankle reflexes. Tr. 576-577. He was restarted on Norco and Ultram. Tr. 577. Dr. Bauer noted, "he is to recheck with [Bureau of Vocational Rehabilitation] and if this fails he will be looking at disability." Tr. 577. Dr. Bauer wrote, "functional capacity evaluation has significant limitations." Tr. 577.

On September 4, 2015, more than a week after Craig's hearing with the ALJ, Craig saw Amelia S. Prack, M.D., at Fischer Titus Medical Care.[1] Tr. 553-554. The reason for his visit was for continuing difficulty with low back pain and his application for disability. Tr. 552. Craig reported bilateral numbness of his antero-lateral thighs, difficulty with position changes due to low back pain, and an inability to sit for more than 15-20 minutes. Tr. 552. He also reported that lifting objects exacerbates his problems and that he is limited to carrying relatively light objects. Tr. 552. He reported no other lower extremity numbness and no lower extremity weakness. Tr. 552. Upon exam, Dr. Prack noted that Craig was in no apparent distress. Tr. 552. He had some flattening of his lumbar spine, a well-healed surgical scar, and no bony or muscle tenderness. Tr. 552. He had decreased sensation in the front and side of his thighs but nowhere else in his lower extremities, diminished or absent reflex in the knees and ankles, and moderately limited range of motion in his back in all planes. Tr. 553. She observed that he was careful with position changes. Tr. 553.

### C. Medical Opinion Evidence

#### 1. Dr. Amelia Prack's opinion

---

[1] Previously, Craig had seen Dr. Eric Prack at Fischer Titus Medical Care.

On September 4, 2015, the same day as his initial and only visit, Dr. Amelia Prack completed a Medical Source Statement on behalf of Craig. Tr. 550-551. Based on his reports of low back pain, Dr. Prack opined that Craig could lift or carry 5-10 pounds occasionally, stand or walk for a total of "perhaps 2" hours in a workday (and could do so without interruption for a few minutes only), and could sit "perhaps 2" hours in a workday (and could do so without interruption for 15-20 minutes). Tr. 550. Based on his decreased range of motion in his back and reported increased low back pain, Dr. Prack found that Craig could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push/pull, or use fine and gross manipulation. Tr. 550-551. She assessed him with environmental restrictions due to an increase in migraine headaches. Tr. 551. She opined that Craig experiences severe pain that interferes with his concentration, takes him off task, and causes absenteeism. Tr. 551. Finally, Dr. Prack wrote that Craig would require additional unscheduled rest periods during an eight hour workday, stating, "sustained activity is not possible for him." Tr. 551.

### 2. Physical Therapist Melissa Shade's opinion

On November 13, 2014, Craig saw physical therapist Melissa Shade, P.T., for a functional capacity evaluation "to determine his current physical tolerance in regards to material and non-material handling activities and to assess his ability to return to work." Tr. 414. Craig reported to Shade that his usual pain level is a 6/10 and that his pain increased during the course of the 1-hour evaluation to 9/10. Tr. 916. The evaluation found the following: diminished grip and pinch strength, trunk mobility limited by 50% in all directions, and full range of motion of upper and lower extremities with discomfort during some extension, flexion and adduction. Tr. 415. Shade opined that Craig could infrequently lift 5-10 pounds and carry 10 pounds; it was not recommended that he bend, squat, stoop or kneel; he could occasionally walk; could sit and stand

for no more than 20 minutes before requiring a postural change; and could occasionally push, reach and climb stairs. Tr. 415-416. Shade opined that "any environmental conditions may be a trigger for migraines" and that his migraines interfere with his ability to work/concentrate. Tr. 416. She wrote, "It is also felt that Mr. Craig would require additional rest breaks throughout a work day and due to his pain level he would probably have difficulty working consecutive days without calling off work frequently." Tr. 416.

### 3. Consultative Examiner

On September 4, 2013, Craig saw Sushil M. Sethi, M.D., for a consultative examination. Tr. 379-381. Craig alleged the following conditions: blood clots in both legs in 2000 and 2002, migraine headaches (since 1997), pinched nerve and bulges in his back, back surgery, asthma, and degenerative disease of the neck. Tr. 379. Upon examination, Craig had a supple neck, his lower extremity joints had full ranges of motion, he had hypersensitivity on the tops and bottoms of his feet but normal pinprick sensation and reflexes, a normal gait, was able to walk on tiptoes and heels, and could squat. Tr. 380. He had mild tenderness in his shoulder joints and a restricted range of motion "as he is reluctant to move his shoulders." Tr. 380. He had normal wrists and elbows and grasping, pinching, manipulation and fine coordination. Tr. 380. His thoracic and cervical spine were without muscle spasm, swelling, redness, or deformity, and showed normal ranges of motion. Tr. 381. His lumbar spine showed moderate tenderness at L4-5 and S1, with no spasm, guarding or curvature abnormality. Tr. 381. He had a negative straight leg raising test and normal reflexes. Tr. 381. X-rays showed mild facet arthropathy at L5-S1 and osteophyte arising from the superolateral endplate of L4 on the left of L3-4. Tr. 380. Dr. Sethi opined that Craig's ability to do work-related physical activity such as sitting, standing, walking, lifting, carrying, and handling objects may be moderately limited; that he can sit for 8

hours and stand and walk for 4 hours in an eight-hour workday; and he can carry 20-30 pounds frequently and 40-60 pounds occasionally.  Tr. 381.

### 4. State Agency Reviewers

On September 11, 2013, state agency reviewing physician Leigh Thomas, M.D., reviewed Craig's record.  Tr. 102-104.  Regarding Craig's physical residual functional capacity ("RFC"), Dr. Thomas stated that she was not adopting the prior ALJ's 2012 decision that Craig could perform sedentary work because she found Craig to be not as restricted.  Tr. 103.  Dr. Thomas opined that Craig can perform medium level work with additional environmental and postural limitations.  Tr. 102-103.

On January 15, 2014, state agency reviewing physician Rannie Amiri, M.D., reviewed Craig's record.  Tr. 115-116.  Regarding Craig's RFC, Dr. Amiri adopted the prior ALJ's decision, to wit: that Craig could perform sedentary work, must periodically alternate sitting and standing, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl, and could never climb ladders, ropes and scaffolds.  Tr. 116.  Dr. Amiri explained that Craig had not demonstrated a worsening of his condition since the prior ALJ's decision.  Tr. 116.

### D. Testimonial Evidence

#### 1. Craig's Testimony

Craig was represented by counsel and testified at the administrative hearing.  Tr. 38-59. He lives in a house with his wife and son; the house has stairs, which he takes at least twice a day.  Tr. 42.  He has a driver's license and drives two to three times a week.  Tr. 43.  Typically, he drives to the grocery store, to pick his teenaged son up from school, and to attend some functions of his adult son, who coaches football and baseball.  Tr. 44.  If he drives for more than 10-15 minutes he experiences "a lot of pain in my lower back and my neck" and, if he drives

much farther than that, "I tighten up — like, in between the shoulder area—you know, in the back." Tr. 43.  He drove himself to the hearing that day, a nine-mile drive.  Tr. 44.

Craig had a commercial driver's license; he used to drive a semi-truck and he would also work on the dock, lifting and moving things that a tow motor could not.  Tr. 44-46.  He last performed this work in October 2009, and, thereafter, collected short-term and long-term disability.  Tr. 45.

Craig stated that he is prevented from working because of pain in his lower back, hip and neck areas, and shoulders.  Tr. 46.  He also gets migraines which cause stroke-like symptoms: numbness in his face, fingers, hands, and from his knee to hip in his right leg, and partial numbness in the same location in his left leg.  Tr. 46.  His feet also have little feeling.  Tr. 46-47.  He no longer has the strength to pick things up like used to, nor can he sit very long for any period of time.  Tr. 47.  It hurts for him to walk "for quite a bit"; sometimes he can walk for five minutes and other times for ten minutes before he experiences pain.  Tr. 47.  His migraines "wipe me out."  Tr. 47.  He has to go to a dark room and a lot of times he vomits and uses ice packs on his neck and forehead to ease the pain.  Tr. 47.  His migraines last anywhere between a few hours and one week.  Tr. 47.  On average, they last 6-7 hours.  Tr. 51.  Sitting or standing for very long causes pain in his low back and hip area.  Tr. 47.  He is also a diabetic.  Tr. 47.

Craig stated that, in the past, treatment for his back included physical therapy and back surgery, and that, currently, he takes medication.  Tr. 47-48.  The physical therapy he had consisted of "compressions where they take my backbone and, like, push it down on the vertebras," which made his migraines more severe.  Tr. 48.  Epidural injections triggered his migraines.  Tr. 48.  He takes Norco daily, and, when asked to rate his pain 1-10, 10 being he has to go to the emergency room, he rated that, with Norco, his pain is at a 7-8/10 level.  Tr. 48-49.

Without Norco his pain level was "astronomical": 10/10 and "every once in a while, it would ease up a little bit to a 9. Tr. 49. Also, the weather, rain and cold fronts, make the pain worse. Tr. 49. He takes Flexeril two to three times per week when his muscle spasms are really bad, but it makes him groggy the next day. Tr. 57.

Craig testified that he constantly has a headache, but he has severe ones 2-3 times a week and sometimes 4 times a week. Tr. 50. During a severe migraine, he can go to the bathroom but he usually does so with a dark rag over his eyes. Tr. 51. He sleeps in his room, which has dark curtains, and usually has a trash can in case he gets sick and can't make it to the bathroom. Tr. 51. About a year prior to the hearing, he had a dizzy spell and fell while walking to the bathroom during a migraine and fractured some ribs. Tr. 53. He also has asthma; he uses an albuterol inhaler "maybe once a week" to stop lung spasms that are triggered by the cold or by getting out of breath from exertion. Tr. 51. He currently smokes about 1/3 a pack of cigarettes a day, down from the pack a day that he used to smoke. Tr. 53.

Craig stated that friends, neighbors, and his two sons help him and his wife do chores around the house. Tr. 54. Craig can't mow the lawn because of the bouncing and the vibration from the riding mower. Tr. 54. When bringing in groceries, he is able to carry the lighter items that they purchase from the grocery store. Tr. 54-55. He is able to dress and bathe. Tr. 55. He is able to do the dishes, but it takes him about two hours because he can only wash two or three items at a time before needing to sit down. Tr. 56-57. He spends the majority of the day in the living room or bedroom sitting or reclined. Tr. 56-67. He has difficulty sleeping and wakes up two to three times a night from pain in his back and neck. Tr. 55. He gets between four and six hours of sleep per night. Tr. 55-56. He takes a couple of naps during the day. Tr. 56.

Craig stated that, before his back surgery, he used to go hunting but he can't anymore. Tr. 57. He tried to go deer hunting "a couple of years ago, and with the cold and, you know, the back spasms from walking and stuff and the pain, I couldn't do that anymore." Tr. 57. He lasted "three hours tops." Tr. 57. He can sit in a chair for 15 minutes at most before getting uncomfortable. Tr. 58. When asked if he could perform work that permitted him to alternate between sitting and standing as needed, Craig stated, "with my migraines, I don't know if I can know anybody that would employ me with, you know, being able to miss that much work." Tr. 58. As far as the sitting and standing, he could "probably not" do work that required back and forth sitting and standing 8 hours a day 5 days a week. Tr. 58. The numbness in his legs does not affect his ability to walk. Tr. 58-59. He has difficulty walking on uneven surfaces, like up a hill, because his low back pain comes quicker and it's more intense. Tr. 59.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Richard Oestreich testified at the hearing. Tr. 59. The ALJ discussed with the VE Craig's past relevant work as a truck driver and material handler. Tr. 60-61. The ALJ asked the VE to determine whether a hypothetical individual with Craig's age, education and work experience could perform the work he performed in the past if the individual had the following characteristics: can perform medium work as defined in the Dictionary of Occupational Titles; can lift and carry twenty to thirty pounds frequently and forty to sixty pounds occasionally; can stand and walk only four hours total combined in an eight-hour work day; can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, and scaffolds; should avoid work place hazards such as unprotected heights and dangerous machinery; and, for every hour spent sitting, would need to stand up and walk or stretch for five minutes. Tr. 61. The VE answered that such an individual could not perform

Craig's past relevant work and, further, that the individual could not perform medium work. Tr. 61-62. The ALJ asked if such an individual could perform any work if that individual were limited to light, not medium, work, and the VE answered that such an individual can perform work as packager (400 regional jobs; 15,000 Ohio jobs; 200,000 national jobs), sorter (300 regional jobs; 8,000 Ohio jobs; 140,000 national jobs), and inspector (200 regional jobs; 15,000 Ohio jobs; 120,000 national jobs). Tr. 62.

Next, the ALJ asked the VE whether the hypothetical individual could perform Craig's past work or any other work if the individual were limited to sedentary work and had the following, additional characteristics: can push or pull within the weight limits for lifting or carrying; can occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; is unable to climb ladders, ropes, and scaffolds; and requires the ability to stand up and walk around or stretch for five minutes on an hourly basis. Tr. 63. The VE answered that such an individual could not perform Craig's past work but could perform the following jobs: hand packer (300 regional jobs; 8,000 Ohio jobs; 100,000 national jobs), labeler (250 regional jobs; 12,000 Ohio jobs; 130,000 national jobs), and inspector (300 regional jobs; 17,000 Ohio jobs; 150,000 national jobs). Tr. 63. The ALJ asked the VE if his answer would change if the hypothetical individual would have to avoid hazards such as unprotected heights, dangerous machinery and extreme cold, and the VE stated that his answer would not change. Tr. 64. The ALJ asked if the individual would be eliminated from competitive, unskilled work if he were absent from work two days a month, on average. Tr. 64. The VE replied that such an individual would be precluded from competitive, unskilled work and past work. Tr. 64.

Craig's attorney asked the VE whether a hypothetical individual would be eliminated from competitive work if he were off task twenty percent of the time. Tr. 64. The VE stated that such an individual would not be able to perform competitive work. Tr. 64.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.   If claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant

work, he is not disabled.

5.    If claimant is unable to perform past relevant work, he is not disabled if,
       based on his vocational factors and residual functional capacity, he is
       capable of performing other work that exists in significant numbers in the
       national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her November 24, 2015, decision, the ALJ made the following findings:

1.  The claimant meets the insured status requirement of the Social Security Act through
    December 31, 2015.  Tr. 23.

2.  The claimant has not engaged in substantial gainful activity since February 4, 2012, the
    amended alleged onset date.  Tr. 23.

3.  The claimant has the following severe impairments: degenerative disc disease of the
    lumbar spine; a clotting disorder; asthma; migraines; and obesity.  Tr. 23.

4.  The claimant does not have an impairment or combination of impairments that meets or
    medically equals the severity of one of the listed impairments in 20 CFR Part 404,
    Subpart P, Appendix 1.  Tr. 24.

5.  The claimant has the residual functional capacity to perform sedentary work as defined
    in 20 CFR 404.1567(a) except claimant can lift and carry a maximum of ten pounds.
    The claimant has no limitation in the ability to push and/or pull within the weight limits
    for lifting and carrying.  The claimant can occasionally climb stairs and ramps, balance,
    stoop, kneel, crouch, and crawl.  The claimant is unable to climb ladders, ropes, and
    scaffolds.  The claimant is also precluded from hazards (such as unprotected heights and

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

dangerous machinery) and extreme cold. Additionally, the claimant requires the ability to stand up and walk around or stretch for five minutes on an hourly basis. Tr. 25.

6. The claimant is unable to perform any past relevant work. Tr. 30.

7. The claimant was born on February 27, 1967 and was 44 years old, which is defined as a younger individual age 18-44, on the amended alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49. Tr. 31.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 31.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills. Tr. 31.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 31.

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 4, 2012, through the date of this decision. Tr. 32.

## V. Parties' Arguments

Craig objects to the ALJ's decision on the ground that the ALJ violated the treating physician rule when she discounted the opinion of Dr. Amelia Prack and otherwise failed to follow the regulations regarding the weight assigned to opinion evidence. Doc. 13, pp. 13-17. In response, the Commissioner submits that Dr. Prack was not Craig's treating physician and the ALJ did not err in her consideration of Dr. Prack's opinion or the other opinion evidence. Doc. 15, pp. 7-16.

## VI. Law

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. The ALJ did not err in assessing Dr. Amelia Prack's opinion

### A. Dr. Amelia Prack is not a treating physician

Craig argues that the ALJ erred because she did not following the treating physician rule with respect to Dr. Amelia Prack's opinion. Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502. The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition. *Id*. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]" *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x 496, 507

(6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)).

The plaintiff has the burden of showing that a doctor is a treating physician. *See id*. at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters*, 127 F.3d at 529 (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating physician rule, the court first determines whether the source is a treating source. *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Smith*, 482 F.3d at 876.

The ALJ accurately observed that Dr. Amelia Prack only saw Craig once, the same day that she completed a medical source statement on his behalf, and that she therefore did not have a longstanding treating relationship with him. Tr. 27. Based on this reason (and others discussed in more detail, *infra*), the ALJ gave Dr. Prack's opinion "little" weight. Tr. 26-27. Craig argues that Dr. Amelia Prack's opinion was entitled to controlling weight because she is his treating physician. Doc. 13, p. 13. He admits, however, that he saw Dr. Amelia Prack only one time, the day that she provided an opinion regarding his ability to perform work-related activities. Doc. 13, p. 13. But seeing a physician only one time is not sufficient to consider that doctor a treating source. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006) ("a plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship"); *Oliver v. Comm'r of Soc. Sec.,* 415 F. App'x 681, 684 (6th Cir. 2011) (physician relationship with claimant "was extremely limited in nature, stemming from a single, post-litigation referral" such that physician was not a treating physician).

Craig argues that the ALJ "overemphasized" the fact that Dr. Prack saw Craig only once. Doc. 13, p. 14. In support of his argument he cites *Abram v. Comm'r of Soc. Sec.*, 2016 WL 775337 (N.D. Ohio Feb. 29, 2016), and *Montanez v. Comm'r of Soc. Sec.*, 2013 WL 6903764, (N.D. Ohio Dec. 31, 2013). Doc. 13, p. 14. Neither case supports Craig's apparent position that one visit establishes a doctor as a treating physician. In *Abram*, the ALJ committed error because the ALJ did not discuss how many times the claimant had seen the doctor, did not state whether the claimant and the doctor had a treating relationship, and had not assigned any weight to the doctor's opinion. 2016 WL 775337 at *5-6. In *Montanez*, the ALJ erred because the ALJ did not make a finding as to whether the doctor was a treating source despite the fact that the record showed that the doctor was a treating source, such that the court was unable to conduct a meaningful review. 2013 WL 6903764, at *1. Here the ALJ assigned weight to Dr. Prack's opinion, discussed how many times Craig had seen her, and stated that they did not have a longstanding treating relationship. Tr. 26-27.

Craig has not met his burden of showing that Dr. Amelia Prack was his treating physician whose opinion is entitled to presumptive weight. Thus, the ALJ was not required to apply the treating physician rule to Dr. Prack's opinion; the opinion was not due presumptive weight and the ALJ was not required to give good reasons for assigning it less than controlling weight. *See Wilson*, 378 F.3d at 544.

### B. Regardless, the ALJ's reasons for discounting Dr. Prack's opinion are consistent with the treating physician rule

Regardless of whether the ALJ was required to follow the treating physician rule when considering Dr. Prack's opinion, her reasoning when discussing Dr. Prack's opinion was consistent with the treating physician rule. As set forth above, if a physician is a treating source the ALJ must give the physician's opinion controlling weight if she finds the opinion well

supported by medically acceptable clinical and laboratory diagnostic techniques and not

inconsistent with the other substantial evidence in the record. *Wilson*, 378 F.3d at 544. If an

ALJ decides to give a treating source's opinion less than controlling weight, she must give "good

reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the

weight given to the treating physician's opinion and the reasons for that weight. *Id.* In deciding

the weight given, the ALJ must consider factors such as the length, nature, and extent of the

treatment relationship; specialization of the physician; the supportability of the opinion; and the

consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c); *Bowen v.*

*Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

To recap: Dr. Prack assessed Craig's severe limitations based on Craig's subjective

reports of back pain, decreased range of motion in his lower back, and migraines. The ALJ gave

Dr. Prack's opinion "little" weight, observed that she only saw Craig once and filled out her

opinion form at that visit, and did not have a treating relationship with Craig. Tr. 26-27. The

ALJ continued,

> Moreover, [Dr. Prack's] extreme limitations are not supported by both her physical exam
> findings or by the other objective medical evidence of record. As discussed in greater
> detail below, there are minimal objective findings relative to the claimant's alleged back
> pain and the claimant's headaches are generally well controlled with medications per the
> medical record.

Tr. 27. In other words, the ALJ found that Dr. Prack's opinion was not supported by objective

evidence in the record and was inconsistent with other substantial evidence in the record. She

gave good reasons, including the length, nature and extent of the treatment relationship, the

supportability of Dr. Prack's opinion, and the consistency of the opinion with the record as a

whole. *See Wilson*, 378 F.3d at 544.

Furthermore, the ALJ's reasons are supported by substantial evidence. The ALJ recited the evidence she relied upon. She discussed Craig's MRI and x-ray results, including the mostly mild findings. Tr. 28. She recognized that, while he had some positive examination findings such as positive straight leg raise testing, spinal tenderness, muscle spasms, and positive facet loading maneuvers, Craig also exhibited a normal gait and station, no crepitus in any of his joints, no radiculopathy in his upper extremities or thoracic area, and no signs of myelopathy. Tr. 28. He had not been observed to be in acute distress. Tr. 26. The ALJ also noted that Craig's treatment for his migraines had been minimal and conservative and that he had reported in June 2015 that they were well controlled on his medication. Tr. 29.

Craig argues that Dr. Prack's opinion is supported by medical imaging "as far back as 2010." Doc. 13, p. 15. But the ALJ considered Craig's medical imaging from 2010 (an electromyogram in January and an MRI in March) as well as x-rays taken in 2013 and 2015. Tr. 28. She accurately remarked that these contained mostly mild findings and concluded, "While the evidence confirms the presence of degenerative disc disease and radiculopathy, the evidence does not support the claimant's allegations regarding the severity and frequency of pain and limitations." Tr. 28.[3] Beyond disagreeing with the ALJ's conclusion, Craig does not describe an error.

Craig's additional arguments are unavailing. He submits that Dr. Prack's opinion is supported by multiple physical examinations by other physicians, Drs. Bauer and Hedaya (Doc. 13, p. 15), but the ALJ considered and discussed these physical exam findings. Tr. 28. Craig contends that physical therapist Shade's findings corroborate Dr. Prack's opinion, Doc. 13, p. 14, but the ALJ considered Shade's opinion and gave it "some weight," discounting Shade's

---

[3] Moreover, Craig had a lumbar laminectomy in October 2010 and a prior ALJ had found Craig not disabled in February 2012, about two years after Craig's early 2010 imaging studies. Tr. 22.

limitations regarding sitting and manipulative activities as unsupported by objective evidence. Tr. 26. Craig complains that the ALJ did not assign more than "some" weight to any medical opinion with respect to Craig's physical impairments.[4] Doc. 13, p. 16. He does not cite legal authority providing that an ALJ must give more than "some" weight to any medical opinion in the record. Instead, he speculates that the ALJ must have substituted her own beliefs in place of the medical opinions and that this is not permitted. By way of illustration, he criticizes the ALJ for giving "little" weight to consultative examiner Dr. Sethi's opinion. Doc. 13, p. 16. Dr. Sethi found that Craig could perform medium work. The ALJ found that "the longitudinal record does not support sustained improvement to the extent opined by Dr. Sethi" and found Craig to be a good deal more limited than Dr. Sethi opined. Tr. 26. It is not entirely clear why Craig criticizes this finding; in essence, he agrees with the ALJ's assessment of Dr. Sethi's opinion and appears instead to find fault with Dr. Sethi. This does not describe an error on the part of the ALJ. Craig's final argument is that the ALJ erred because she gave more weight to a state agency reviewing physician than a treating or examining source, but this is not error. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (there is no requirement that an ALJ give greater weight to an examining or treating source opinion over a state agency reviewer's opinion); SSR 96–6p, 1996 WL 374180, at *3.

Essentially, Craig urges this Court to reweigh the evidence, which the Court cannot do. *See Garner*, 745 F.2d at 387. The ALJ's decision is supported by substantial evidence and it must, therefore, be affirmed. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

---

[4] The ALJ assigned "great" weight to three opinions in the record relevant to Craig's alleged mental impairments. Tr. 24.

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.


Dated: August 25, 2017

Kathleen B. Burke
United States Magistrate Judge